**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| MARTHA MATLOCK, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>UNLIMITED TECHNOLOGY SYSTEMS, LLC, and MARY BIRD PERKINS CANCER CENTER,<br><br>Defendants. | Case No. 1:26-cv-00729<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Martha Matlock ("Plaintiff") individually, and on behalf of all others similarly situated, by and through her undersigned counsel, brings this Class Action Complaint against Defendants Unlimited Technology Systems, LLC ("Unlimited") and Mary Bird Perkins Cancer Center ("Mary Bird Perkins") (collectively, "Defendants"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiff and the proposed Class Members bring this class action lawsuit on behalf of all persons who indirectly entrusted Defendants with sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (collectively, "Private Information") that was impacted in a data breach (the "Data Breach" or the "Breach").

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

2. Plaintiff's claims arise from Defendants' failure to properly secure and safeguard Private Information that was indirectly entrusted to them and their accompanying responsibility to store and transfer that information.

3. Unlimited is a healthcare technology company that provides software and technology solutions to specialty medical practices and healthcare providers, particularly in oncology and other complex-care fields, and services over 4,500 clinical offices and 6,500 specialty providers ("Clients").[2]

4. Mary Bird Perkins provides cancer treatments to patients throughout the state of Louisiana.

5. Unlimited had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on affirmative representations to Plaintiff and Class Members through its privacy policy ("Privacy Policy"),[3] to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

6. On October 19, 2025, Unlimited discovered unauthorized activity within its

---

[2] *Our Mission & Vision: Powering the Financial Strength of Specialty Healthcare*, Unlimited, https://www.unlimitedsystems.com/company/ (last visited July 24, 2026).

[3] *Privacy Policy*, Unlimited (Aug. 3, 2020), https://www.unlimitedsystems.com/wp-content/uploads/2023/01/Privacy-Policy_Unlimited-Systems-20200803.pdf (last visited July 24, 2026) ("We use a variety of security technologies and procedures to try to protect your Personal Information from unauthorized access, use, or disclosure. We follow generally accepted industry standards to protect any information submitted to us, both during transmission and after we receive it. If we collect sensitive information, it is encrypted and transmitted to us in a secure way. You can verify this by looking for a closed lock icon at the bottom of your web browser or looking for "https" at the beginning of the address of the web page. We use encryption to protect sensitive information transmitted online and we also protect your information offline. Only employees who need the information to perform a specific job (for example, customer service) are granted access to personally identifiable information. Any computers/servers with personally identifiable information are kept in a secure environment.").

commercial datacenter.[4] Unlimited launched an investigation with the assistance of a cybersecurity forensics firm, and determined that an unauthorized actor obtained Private Information from Unlimited's network and systems between October 5 and October 10, 2025.[5]

7. Recently, on or around July 21, 2026, Defendants began sending Notice of Data Breach letters to victims informing them that their Private Information had been exposed in the Data Breach ("Notice").[6]

8. The following types of Private Information were compromised as a result of the Data Breach: names, health insurance and patient balance information (such as insurance policy numbers or claims/benefits information), medical information (such as medical record numbers, dates of service, and diagnosis information), scanned documents (such as driver's licenses or other government identification, insurance cards, and intake forms), Social Security numbers, and other personal information (such as dates of birth, emails, addresses, phone numbers, or demographic information).[7]

9. Defendants failed to take precautions designed to keep individuals' Private Information secure.

10. Defendants owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendants collected, used, and derived a benefit from the Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

---

[4] *See* sample *Notice of Service Provider Data Breach*, Unlimited (July 21, 2026), attached hereto as **Exhibit A**.

[5] *Id*.

[6] *Id*.

[7] *Id*.

11. The Private Information compromised in the Data Breach contained highly sensitive data, representing a gold mine for data thieves. The data included, but is not limited to, Social Security numbers and sensitive medical information that Unlimited maintained on behalf of Plaintiff and Class Members, that it received from its Clients, including Mary Bird Perkins.

12. Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

13. As a result of the Data Breach, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

14. Plaintiff brings this class action lawsuit to address Defendants' inadequate safeguarding of Class Members' Private Information that they maintained on behalf of Plaintiff and Class Members, and their failure to provide timely and adequate notice to Plaintiff and Class Members of the Breach and the types of information unlawfully accessed.

15. The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure the Private Information left them vulnerable to an attack.

16. Upon information and belief, Plaintiff's Private Information is available on the dark web as a result of the Data Breach.

17. Upon information and belief, Defendants failed to properly monitor and implement security practices with regard to the computer network and systems that housed the Private Information. Had Defendants properly monitored their IT Networks, they would have discovered the Breach sooner.

18. Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct as the Private Information that Defendants received and maintained on behalf of Plaintiff and Class Members is now in the hands of data thieves and other unauthorized third parties.

19. Plaintiff seeks to remedy these harms on behalf of herself, and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

20. Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for negligence, negligence *per se*, breach of third-party beneficiary contract, breach of implied contract, and unjust enrichment.

## PARTIES

21. Plaintiff is a citizen and resident of Keithville, Louisiana.

22. Defendant Unlimited Technology Systems, LLC, is an Ohio limited liability company maintaining its principal place of business in Cincinnati, Ohio. Unlimited's registered agent is Corporation Service Company, 1160 Dublin Rd Ste 400, Columbus, Ohio 43215.

23. Defendant Mary Bird Perkins Cancer Center is Louisiana corporation with its principal place of business located at 4950 Essen Lane, Baton Rouge, LA 70809.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Unlimited's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Unlimited has its principal place of business located in this District.

25. This Court has general personal jurisdiction over Defendant Unlimited because Unlimited is registered to do business and maintains its principal place of business in this District.

26. This Court has specific personal jurisdiction over Defendant Mary Bird Perkins because it purposefully availed itself to the laws of this state by maintaining Plaintiff's and Class Member's Private Information in this District.

27. Venue is proper in this Court because Unlimited's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendants

28. Unlimited is a healthcare technology company that provides software and technology solutions to specialty medical practices and healthcare providers, particularly in oncology and other complex-care fields, and services over 4,500 clinical offices and 6,500 specialty providers.[8]

---

[8] https://www.unlimitedsystems.com/company, *supra*, n.2.

29. Mary Bird Perkins, a client of Unlimited, provides comprehensive cancer services and treatment to its patients in Louisiana.

30. As a condition of doing business, Unlimited requires individuals to indirectly entrust it with highly sensitive personal information. In the ordinary course of receiving services from Unlimited's Clients, Plaintiff and Class Members were required to indirectly provide their Private Information to Unlimited. But for Unlimited's collection of Plaintiff's and Class Members' Private Information from its Clients, Defendants could not provide its services.

31. Upon information and belief, and through its Privacy Policy, Unlimited made promises and representations to individuals, including Plaintiff and Class Members, that their Private Information would be kept safe and confidential, and that the privacy of that information would be maintained.

32. Plaintiff and Class Members indirectly provided their Private Information to Unlimited in connection with receiving services from its Clients with the reasonable expectation and on the mutual understanding that Unlimited would comply with its obligations to keep such information confidential and secure from unauthorized access.

33. As a result of collecting and storing the Private Information of Plaintiff and Class Members for its own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and the Class Members' Private Information from disclosure to third parties.

**B. The Data Breach**

34. Beginning on or around July 20, 2026, Mary Bird Perkins began notifying victims of the Data Breach, informing them by Notice:

> **What Happened**
>
> On October 19, 2025, Unlimited discovered unauthorized activity within its commercial datacenter. Upon discovering the unauthorized activity, Unlimited hired a leading cybersecurity forensic firm to conduct an investigation, notified law enforcement, and conducted a review of the data involved. Through this investigation, Unlimited determined that an unauthorized actor may have obtained a copy of some of your personal information between October 5 and October 10, 2025.
>
> **What Information Was Involved**
>
> Unlimited has determined that some of the data involved in the security incident may have included your name and information in one or more of the following categories: health insurance and patient balance information (such as insurance policy numbers or claims/benefits information), medical information (such as medical record number, dates of service, and diagnosis information), scanned documents (such as driver's licenses or other government identification, insurance cards, and intake forms), Social Security number, and other personal information (such as date of birth, email, address, phone number, or demographic information).[9]

35. To be clear – there are numerous issues with Defendants' Data Breach, but the deficiencies in the Data Breach notification letter exacerbate the circumstances for victims of the Data Breach: (1) Defendants waited more than ***nine months*** to notify Plaintiff and Class Members of the Data Breach; (2) Defendants fail to state whether they were able to contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that Defendants continues to maintain is secure; and (3) Defendants fail to state how the Data Breach itself occurred. All of this information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity and wide array of information compromised in this specific breach.

36. Moreover, in its Notice, Defendants failed to specify whether they undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to

---

[9] Ex. A.

inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendants, and whether Defendants set up any mechanism for Class Members to report any misuse of their data.

37. Furthermore, Defendants' delay in notifying Plaintiff and Class Members of the Data Breach is in direct violation of Defendants' responsibilities under the data breach notification statute in Ohio. *See* Ohio Rev. Code Ann. § 1349.19(B)(2), which requires that the disclosure notification be "made in the most expedient time possible but not later than forty-five days following its discovery." Defendants failed to meet this requirement by over 200 days.

38. Defendants had obligations created by the Federal Trade Commission ("FTC") Act, HIPAA, contract, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

39. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information, redacting it, or deleting it when it is no longer needed.

40. The Data Breach resulted in an unauthorized third party accessing and acquiring files containing unencrypted Private Information of Plaintiff and Class Members. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

41. Upon information and belief, Plaintiff's Private Information, and that of Class Members, was subsequently published on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

42. Defendants failed to take precautions designed to keep individuals' Private Information secure.

43. Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

44. Defendants failed to take adequate measures to protect their computer systems against unauthorized access.

45. The Private Information that Defendants allowed to be exposed in the Data Breach is the type of private information that Defendants knew or should have known would be the target of cyberattacks.

46. Despite their own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[10] Defendants failed to disclose that their systems and security practices were inadequate to reasonably safeguard Plaintiff's and Class Members' Private Information.

47. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[11] Immediate notification of a Data Breach is critical so that those impacted can take measures to protect themselves.

**C. Defendants Acquire, Collect, and Store Plaintiff's and Class Members' Private Information**

48. As a condition of receiving services from Unlimited's Clients, Plaintiff and Class Members were required to indirectly give their sensitive and confidential Private Information to Unlimited.

---

[10] *Protecting Personal Information: A Guide for Business,* FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited July 24, 2026).

[11] *Id.*

49. Defendants retained and stored this information and derives a substantial economic benefit from the Private Information that they collect. But for the collection of Plaintiff's and Class Members' Private Information from Unlimited's Clients, Unlimited would be unable to offer its services.

50. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

51. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendants to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

52. Defendants could have prevented this Data Breach by properly securing, redacting, and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

53. Upon information and belief, Defendants made promises to Plaintiff and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information, including through their privacy policies.

54. Defendants' negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**D. Data Breaches Are Preventable**

55. Data breaches are preventable. As Lucy Thompson wrote in the *Data Breach and Encryption Handbook*, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security

solutions."[12] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised."[13]

56. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting or redacting the information or deleting it when it is no longer needed. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

57. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[14]

58. To prevent and detect cyberattacks and/or ransomware attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

---

[12] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, in *Data Breach and Encryption Handbook* (Lucy Thompson, ed., 2012).

[13] *Id.* at 28.

[14] U.S. Govt., *How to Protect Your Networks from RANSOMWARE*, at 3, FBI.gov, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited July 24, 2026).

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[15]

59. To prevent and detect cyberattacks or ransomware attacks, Defendants could and should have implemented the following, as recommended by Microsoft Threat Intelligence:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management

[15] *Id.* at 3-4.

- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[16]

60. Given that Defendants were storing the Private Information of Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

61. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach

[16] *See Human-operated ransomware attacks: A preventable disaster*, Microsoft Threat Intelligence (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited July 24, 2026).

and data thieves acquiring and accessing the Private Information of Plaintiff and Class Members.

### E. Defendants Knew or Should Have Known of the Risk of a Cyber Attack Because Entities in Possession of Private Information Are Particularly Susceptible to Cyber Attacks

62. Defendants were on notice that companies storing sensitive PII and PHI are highly susceptible targets for data breaches.

63. Data thieves regularly target entities providing patient services like Defendants due to the highly sensitive information that they maintain. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

64. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting entities like Defendants that collect and store Private Information, preceding the date of the Data Breach.

65. In light of recent high profile data breaches at other industry-leading companies, including, *e.g.*, Change Healthcare Inc. (145 million records, February 2024), Kaiser Foundation Health Plan, Inc. (13 million records, April 2024), Ascension Health (5.6 million records, May 2024), HealthEquity, Inc. (4.3 million records, March 2024), and Acadian Ambulance Service, Inc. (2.8 million records, June 2024), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

66. In August 2014, after a cyberattack on Community Health Systems, Inc., the Federal Bureau of Investigation ("FBI") warned companies storing PHI that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related

systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[17]

67. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[18]

68. In 2022, the largest growth in compromises occurred in the healthcare sector.[19]

69. In 2024, the healthcare industry data breaches exposed the PHI of 276 million Americans, or 81% of the United States population.[20]

70. In 2024, there were a record 3,158 data breaches, similar to the 3,202 breaches reported in 2023. Furthermore, the number of victims affected jumped to 1.73 billion people, which is a 300% increase from 2023 to 2024.[21]

---

[17] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited July 24, 2026).

[18] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited July 24, 2026).

[19] *2022 End-of-Year Data Breach Report*, at 11, Identity Theft Resource Center (Jan. 2023), https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited July 24, 2026).

[20] *Healthcare Data Breach Statistics 2026: 190M Patients, $9.8M Cost*, Patient Protect (May 6, 2026), https://www.patient-protect.com/post/healthcare-data-breach-statistics-2025-why-medical-records-are-worth-10-more-than-credit-cards (last visited July 24, 2026).

[21] Bree Fowler, *Near-Record Number of Data Breaches Reported in 2024, Report Says*, CNET (Jan. 28, 2025), https://www.cnet.com/tech/services-and-software/near-record-number-of-data-breaches-reported-in-2024-report-says/ (last accessed July 24, 2026).

71. Additionally, "In 2024, healthcare data breaches reached an all-time high, with 276,775,457 records compromised – a 64.1% increase from the previous year's record and equivalent to 81.38% of the United States population."[22] A new report issued found that "more than 2,400 security leaders and found that the top predicted threat for 2025 is ransomware. According to the report, nearly 1 out of every 3 security professionals (38%) believe ransomware will become an even greater threat when powered by AI."[23] This is particularly alarming as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from businesses "lack of cybersecurity expertise and significant security resources."[24]

72. The vast number of healthcare data breaches is due to the fact that medical records command a price premium on the dark web:[25]

| **Data Type** | **Market Value** | **Exploitation Window** |
|---|---|---|
| Credit Card Data | $30–$50 | Hours to days (cards canceled) |
| Email/Password Combos | $5–$15 | Weeks (password resets) |
| Full Medical Records | $260–$310 | Years to decades (immutable) |

73. Indeed, when compromised, healthcare-related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the

---

[22] Chuck Brooks, *Key Cybersecurity Challenges In 2025—Trends And Observations*, Forbes (Apr. 5, 2025), https://www.forbes.com/sites/chuckbrooks/2025/04/05/key-cybersecurity-challenges-in-2025-trends-and-observations (last accessed July 24, 2026).

[23] *Id.*

[24] *Id.*

[25] *Healthcare Data Breach Statistics 2026*, https://www.patient-protect.com/post/healthcare-data-breach-statistics-2025-why-medical-records-are-worth-10-more-than-credit-cards, *supra*, n.20.

victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[26]

74. The victims of healthcare data breaches such as this pay with their lives, time, and credit.[27]

75. "Unlike credit fraud, medical identity theft never expires — it follows victims indefinitely. A single altered record can trigger misdiagnoses, denied claims, and credit damage for years."[28]

76. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all.[29] Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[30]

77. Healthcare-related breaches have continued to rapidly increase because electronic health data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other

[26] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited July 24, 2026).

[27] *Healthcare Data Breach Statistics 2026*, https://www.patient-protect.com/post/healthcare-data-breach-statistics-2025-why-medical-records-are-worth-10-more-than-credit-cards, *supra*, n.20.

[28] *Id.*

[29] *See Study: Medical identity theft is costly for victims*, https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/, *supra*, n. 26.

[30] *Id*.

organization, including credit bureaus, have so much monetizable information stored in their data centers."[31]

78. As companies maintaining PHI, Defendants knew, or should have known, the importance of safeguarding the Private Information indirectly entrusted to them, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on Plaintiff and Class Members as a result of a data breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**F. Defendants Failed to Comply with HIPAA.**

79. Defendants are covered entities or business associates under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

80. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[32] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

81. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

---

[31] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, Chief Healthcare Executive (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited July 24, 2026).

[32] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

82. HIPAA's Security Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

83. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

84. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

85. HIPAA's Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

86. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[33]

---

[33] *See* HHS, *Breach Notification Rule* (last reviewed July 26, 2013), https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last accessed July 24, 2026).

87. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

88. HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

89. HIPAA requires a covered entity to have and apply appropriate sanctions against employees of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

90. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

91. HIPAA also requires the U.S. Department of Health and Human Services ("HHS") Office of Civil Rights ("OCR") to issue annual guidance documents on the provisions of the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example:

> HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."[34]

The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."[35]

**G. Defendants Failed to Comply with FTC Guidelines.**

92. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

93. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[36] The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to

---

[34] HHS, *Security Rule Guidance Material* (last reviewed Apr. 8, 2026), https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited July 24, 2026).

[35] HHS, *Guidance on Risk Analysis* (last reviewed Sept. 26, 2025), https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited July 24, 2026).

[36] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf, *supra*, n.10.

correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

94. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

95. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45 *et seq*. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

96. Such FTC enforcement actions include those against businesses that fail to adequately protect customer data, like Defendants here. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

97. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect Private Information

they maintain. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

98. The FTC has also recognized that personal data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[37]

99. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

100. Defendants were at all times fully aware of their obligation to protect the Private Information of individuals whose data they maintained, yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from such failure.

**H. Defendants Failed to Comply with Industry Standards.**

101. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

102. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and

---

[37] Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable, Washington D.C.* (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 24, 2026).

Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[38]

103. The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.
b. Use security software to protect data.
c. Encrypt sensitive data, at rest and in transit.
d. Conduct regular backups of data.
e. Update security software regularly, automating those updates if possible.
f. Have formal policies for safely disposing of electronic files and old devices.
g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

104. Further, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including: (i) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps;

---

[38] *The 18 CIS Critical Security Controls*, Center for Internet Security, https://www.cisecurity.org/controls/cis-controls-list (last visited July 24, 2026).

(ii) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated;" and (iii) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[39]

105. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

### I. Defendants Breached Their Duty to Safeguard Plaintiff's and Class Members' Private Information

106. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with

[39] *Shields Up: Guidance for Organizations*, Cybersecurity and Infrastructure Security Agency, https://www.cisa.gov/shields-guidance-organizations (last visited July 24, 2026).

industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

107. Upon information and belief, Defendants breached their obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect individuals' Private Information;

c. Failing to properly monitor their own data security systems for existing intrusions;

d. Failing to sufficiently train their employees regarding the proper handling of Private Information;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTC Act;

f. Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

g. Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' Private Information.

108. Upon information and belief, Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted Private Information.

109. Had Defendants remedied the deficiencies in their information storage and security

systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

110. Accordingly, Plaintiff's and Class Members' lives were severely disrupted. Moreover, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Unlimited's Clients.

### J. Plaintiff and Class Members are at a Significantly Increased and Substantial Risk of Fraud and Identity Theft as a Result of the Data Breach

111. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[40] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

112. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

---

[40] *FTC Information Injury Workshop*, FTC (Oct. 2018), https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited July 24, 2026).

113. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

114. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

115. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

116. One such example of how malicious actors may compile Private Information is through the development of "Fullz" packages.

117. Cybercriminals can cross-reference two (2) sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally

stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

118. The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

119. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for seven years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports. However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

120. Identity thieves can also use stolen personal information such as names and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to

obtain government benefits, or to file a fraudulent tax return using the victim's information. Also, identity thieves may obtain a job using the victim's information, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

121. The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its *2023 Consumer Impact Report*. After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:[41]

- 77-percent experienced financial-related problems;
- 29-percent experienced financial losses exceeding $10,000;
- 40-percent were unable to pay bills;
- 28-percent were turned down for credit or loans;
- 37-percent became indebted;
- 87-percent experienced feelings of anxiety;
- 67-percent experienced difficulty sleeping; and
- 51-percent suffered from panic or anxiety attacks.

122. The Private Information stolen in this Data Breach was particularly harmful.

123. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and Class Members, can lead to identity theft and extensive financial fraud.

124. According to the Social Security Administration ("SSA"), each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private

---

[41] *2023 Consumer Impact Report*, at 9, 22, 24–25, Identity Theft Resource Center (Aug. 2023), https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf (last visited July 24, 2026).

information increases."[42] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[43]

125. In fact, "A stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[44] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[45]

126. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

127. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[46]

---

[42] SSA, *Avoid Identity Theft: Protect Social Security Numbers*, https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases (last visited July 26, 2026).

[43] *Id.*

[44] *See* Equifax, *How to Protect Yourself from Social Security Number Identity Theft*, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited July 24, 2026)

[45] *See* Julia Kagan, *Understanding Social Security Numbers (SSN): Key Facts & Purposes*, Investopedia (July 15, 2026), https://www.investopedia.com/terms/s/ssn.asp (last visited July 26, 2026).

[46] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 26, 2026).

128. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.")

129. Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

130. While credit card information and associated PII can sell for as little as $1–$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[47] This is because, as the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[48]

---

[47] *Data Breaches: In the Healthcare Sector*, Center for Internet Security, https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited July 24, 2026).

[48] *Warning Signs of Identity Theft*, FTC (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited July 24, 2026).

131. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

132. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[49]

133. The ramifications of Defendants' failure to keep Private Information secure are long-lasting and severe. Once it is stolen, fraudulent use of such information and damage to victims may continue for years.

134. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

135. It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is

[49] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News (Feb. 7, 2014), https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited July 24, 2026).

misused. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:[50]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

136. PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

137. As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**K. Plaintiff's Experience**

138. Plaintiff indirectly provided her Private Information to Defendants as a condition of receiving services from Mary Bird Perkins, a Client of Unlimited.

139. Upon information and belief, Defendants were in possession of Plaintiff's Private Information before, during, and after the Data Breach. Upon information and belief, Plaintiff is a victim of the Data Breach.

140. Plaintiff would not have allowed Defendants, or anyone in Defendants' position, to maintain her Private Information if she believed that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

---

[50] *Report to Congressional Requesters: Personal Information*, GAO (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited July 24, 2026).

141. Plaintiff greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

142. Plaintiff stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

143. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

144. As a result of the Data Breach, Plaintiff has spent significant time researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords, and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

145. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in notifying her that her Private Information was acquired by criminals as a result of the Data Breach.

146. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

147. Plaintiff has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

148. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendants obtained from Plaintiff; and (g) other economic and non-economic harm.

## CLASS ALLEGATIONS

149. Plaintiff brings this Class Action Complaint, individually and on behalf of the following Class:

> Nationwide Class: All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach (the "Class", and the individuals in the Class, the "Class Members").

150. Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

151. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

152. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

153. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Upon information and belief, Plaintiff estimates that the Class is comprised of at least thousands of members, if not more. The Class is sufficiently numerous to warrant certification.

154. Typicality of Claims: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class, had her Private Information compromised as a result of the Data Breach. Plaintiff is a member of the Class, and her claims are typical of the claims of the members of the Class. The harm suffered by Plaintiff is similar to that suffered by all other Class Members which was caused by the same misconduct by Defendants.

155. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

156. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful

conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

157. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c. Whether Defendants' storage of Plaintiff's and Class Members' Private Information was done in a negligent manner;

d. Whether Defendants had a duty to protect and safeguard Plaintiff's and Class Members' Private Information;

e. Whether Defendants' conduct was negligent;

f. Whether Defendants' conduct violated Plaintiff's and Class Members' privacy;

g. Whether Defendants took sufficient steps to protect individuals' Private Information;

h. Whether Defendants were unjustly enriched; and

i. The nature of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

158. Information concerning Defendants' policies is available from Defendants' records.

159. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

160. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct

for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

161. Given that Defendants have not indicated any changes to their conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

**COUNT I**
**NEGLIGENCE**
**(On behalf of Plaintiff and the Class against Defendants)**

162. Plaintiff restates and realleges all of the allegations stated in paragraphs 1 through 164 as if fully set forth herein.

163. Defendants knowingly collected, possessed, and maintained Plaintiff's and Class Members' Private Information, and therefore had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

164. Defendants' duty also included a responsibility to implement processes by which they could detect and analyze a breach of their security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

165. Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

166. Defendants owed a duty of care to Plaintiff and Class Members whose Private Information was indirectly entrusted to them. Defendants' duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;

b. To protect the Private Information in their possession using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA and the FTCA;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

167. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

168. Defendants' duty also arose because Defendants were bound by industry standards to protect the confidential Private Information indirectly entrusted to them.

169. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

170. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Defendants' possession.

171. Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

172. Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

173. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to periodically ensure that their email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA and HIPAA;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

174. Defendants acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

175. Defendants had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to indirectly entrust Defendants with their Private Information through their dealings with Unlimited's Clients was predicated on the understanding that Unlimited's Clients and its third-party vendors, including Mary Bird Perkins, would take adequate security precautions. Moreover, only Defendants had the ability to protect their systems (and the Private Information that they stored on them) from attack.

176. Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

177. As a result of Defendants' ongoing failure to notify Plaintiff and Class Members regarding the Data Breach, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

178. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and loss of time and money to monitor their accounts for fraud.

179. As a result of Defendants' negligence in breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

180. Defendants also had independent duties under state laws that required them to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

181. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

182. The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

183. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

184. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On behalf of Plaintiff and the Class against Defendants)**

185. Plaintiff restates and realleges the allegations in paragraphs 1 through 164 as if fully set forth herein.

186. Pursuant to Section 5 of the FTCA, Defendants had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

187. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Defendants had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

188. Specifically, pursuant to HIPAA, Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

189. Defendants breached their duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

190. Specifically, Defendants breached their duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

191. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendants' duty in this regard.

192. Defendants also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

193. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendants' networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

194. Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and Defendants' failure to comply with both constitutes negligence *per se*.

195. Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to Defendants' negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

196. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

197. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

198. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On behalf of Plaintiff and the Class against Defendant Unlimited)**

199. Plaintiff restates and realleges the allegations in paragraphs 1 through 164 as if fully set forth herein.

200. Defendant Unlimited (for purposes of this Count, "Defendant") entered into contracts, written or implied, with its Clients throughout the country that contracted with Defendants to perform services. Upon information and belief, these contracts are virtually identical between and among Defendant and its Clients around the country whose customers, including Plaintiff and Class Members, were affected by the Data Breach.

201. In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

202. These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its Clients. Defendant knew that if it were to breach these contracts with its Clients, its Clients' customers—including Plaintiff and Class Members—would be harmed.

203. Defendant breached the contracts it entered into with its clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detect the Data Breach and notify Plaintiff and Class Members thereof.

204. Plaintiff and the Class were harmed by Defendant's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have

sustained as a direct and proximate result thereof.

205. Plaintiff and Class Members are also entitled to their costs and attorneys' fees incurred in this action.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
## (On behalf of Plaintiff and the Class against Defendant Mary Bird Perkins)

206. Plaintiff restates and realleges the allegations in paragraphs 1 through 164 as if fully set forth herein.

207. Defendant Mary Bird Perkins (for purposes of this Count, "Defendant") offered to provide services to Plaintiff and the Class Members in exchange for their Private Information.

208. Defendant entrusted the Private Information of Plaintiff and the proposed Class Members to third-party vendors, Defendant Unlimited.

209. Plaintiff and the Class Members accepted Defendant's offer by providing Private Information to Defendant, and in turn to third-party vendor Unlimited, in exchange for receiving Defendant's services.

210. In turn, Defendant, agreed it would not disclose the Private Information it collected to unauthorized persons and that it would safeguard Plaintiff's and the Class's Private Information.

211. Implicit in the parties' agreement was that Defendant would provide Plaintiff and the Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

212. Plaintiff and the Class Members would not have entrusted their Private Information to Defendant in the absence of such an agreement.

213. Defendant materially breached the contract(s) each had entered into with Plaintiff and the Class Members by failing to safeguard their Private Information, including the failure to

supervise third-party vendor Unlimited to ensure Private Information was properly safeguarded, and by failing to notify Plaintiff and Class Members of the Data Breach. Defendant further breached the implied contracts with Plaintiff and the Class Members by:

a. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

b. Failing to ensure the confidentiality and integrity of electronic Private Information that Defendant created, received, maintained, and transmitted.

214. The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

215. Plaintiff and the Class Members have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendant.

216. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

217. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

218. Defendant failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

219. In these and other ways, Defendant violated its duties of good faith and fair dealing.

220. Plaintiff and the Class Members have sustained injury-in-fact and damages because of Defendant's breaches of its agreements, including breaches thereof through violations of the covenant of good faith and fair dealing.

221. As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and the proposed Class Members and are entitled to actual, compensatory, and consequential damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class against Defendants)**

222. Plaintiff restates and realleges the allegations in paragraphs 1 through 164 as if fully set forth herein.

223. Plaintiff and Class Members conferred a benefit on Defendants by indirectly providing Defendants with their Private Information through their dealings with Defendants' Clients. Moreover, upon information and belief, Plaintiff alleges that payments made to Defendants included payment for cybersecurity protection to protect Plaintiff's and Class Members' Private Information, and that those cybersecurity costs were passed on to Plaintiff and Class Members in the form of elevated prices charged by Defendants. Plaintiff and Class Members did not receive such protection.

224. Upon information and belief, Defendants funds their data security measures from their general revenue, including from payments made to them.

225. As such, a portion of the payments made by Plaintiff and Class Members to Unlimited's Clients, and then to Unlimited, is to be used to provide a reasonable and adequate level of data security in compliance with state and federal regulations and industry standards.

226. Defendants have retained the benefits of their unlawful conduct, including the amounts of payment received indirectly from Plaintiff and Class Members and directly that should have been used for adequate cybersecurity practices that they failed to provide.

227. Defendants knew that Plaintiff and Class Members, indirectly, and Unlimited's Clients, directly, conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments they received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

228. If Plaintiff and Class Members had known that Defendants had not adequately secured their Private Information, they would not have agreed to provide such Private Information.

229. Due to Defendants' conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of their wrongful conduct.

230. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and

is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

231. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

232. Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing Plaintiff as Class Representative of the Nationwide Class requested herein and the undersigned as Class Counsel;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: July 24, 2026

Respectfully submitted,

*/s/ Terence R. Coates*

Terence R. Coates (0085579)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com

Kenneth J. Grunfeld (*pro hac vice* forthcoming)
**KOPELOWITZ OSTROW P.A.**
65 Overhill Rd
Bala Cynwyd, PA 19004
Tel: (954) 525-4100
grunfeld@kolawyers.com

*Attorneys for Plaintiff and the Proposed Class*